UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00068-TBR

MELISSA DAVIES, *et al.*                                                    PLAINTIFFS

v.

TRIGG COUNTY, KENTUCKY, *et al.*                                   DEFENDANTS

### Memorandum Opinion and Order

Plaintiffs Melissa Davies, Beverly Underhill, and Kristie Wint allege that they were terminated or constructively discharged from their positions at Trigg County Hospital after voicing concerns related to hospital hiring practices, staffing policies, and the behavior of supervisors. They filed this action against four defendants: Trigg County, Kentucky; Trigg County Hospital, Inc. (TCH); John Sumner, TCH's Chief Executive Officer; and Fredia Smiley, TCH's Chief Nursing Officer. [DN 1.] Plaintiffs sued the individual defendants, Sumner and Smiley, in both their individual and official capacities. Against each Defendant, each Plaintiff asserts two causes of action, the first arising under 42 U.S.C. § 1983, and the second arising under Sections 1 and 8 of the Kentucky Constitution. *See* [*id*.]

In separate motions, Trigg County and TCH, Sumner, and Smiley moved to dismiss Plaintiffs' claims. [DN 7; DN 8.] Plaintiffs responded to both motions, [DN 13; DN 14], and Defendants replied, [DN 15; DN 16]. Additionally, in response to TCH, Sumner, and Smiley's reply, Plaintiffs filed a motion for leave to file a sur-reply. [DN 17.] TCH, Sumner, and Smiley responded to that motion. [DN 18.] Following briefing on Defendants' motions to dismiss, the Court ordered

the parties to file supplemental briefs addressing "whether Plaintiffs' speech was constitutionally protected under the standard set forth in *Garcetti v. Ceballos*, 547 U.S. 410 (2006)."  [DN 19 at 1.]  All parties filed supplemental briefs and replies, and these three motions are now ripe for adjudication.

Plaintiffs' motion for leave to file a sur-reply [DN 17] is GRANTED, and the Court will consider the proposed sur-reply filed by Plaintiffs in its ruling.  For the reasons explained below, Trigg County's motion to dismiss [DN 7] is GRANTED, and TCH's, Sumner's, and Smiley's motion to dismiss [DN 8] is GRANTED IN PART and DENIED IN PART.

### I. Facts and Procedural History

In early 2015, Trigg County Hospital officials were discussing the possibility of hiring Defendant Fredia Smiley for the vacant Chief Nursing Officer (CNO) position.  [DN 1 at 4.]  Smiley had previously resigned from her position as TCH's Emergency Department Manager, and Plaintiff Kristie Wint had been promoted to fill Smiley's position.  [*Id*. at 3.]  During these discussions, Wint expressed her belief that TCH should not hire Smiley as CNO because of "Smiley's prior treatment of others, which included harassment and bullying," as well as Smiley's lack of a master's degree.  [*Id*. at 4.]  Wint expressed interest in the CNO position, but was not considered.  [*Id*.]

Meanwhile, Defendant John Sumner was hired as TCH's new CEO on or about March 19, 2015, although Plaintiffs allege that Sumner was involved in hospital decision-making prior to this date.  [*Id*.]  After Sumner was hired, a panel

was assembled to interview candidates for the CNO position.   [*Id.* at 5.]   Plaintiffs Wint and Davies both served on this panel.   [*Id.*]   Following interviews of four candidates, Wint once again expressed her opposition to Smiley's hiring, this time to Craig Stallions, TCH's Director of Human Resources.   [*Id.*]   Despite Wint's misgivings, Smiley was offered the CNO position on May 8, 2015.   [*Id.*]

Wint alleges that following Smiley's hiring, both Smiley and Sumner retaliated against her for opposing Smiley.   [*Id.*]   Specifically, Wint says that on three occasions, Smiley issued unwarranted written reprimands, and also placed Wint on a corrective action plan without sufficient cause.   [*Id.*]   Although Wint complained of harassment and retaliation to Stallions, no action was taken by TCH. [*Id.* at 6.]   Eventually, on August 3, 2015, Wint was demoted from Emergency Department Manager to Emergency Department Nurse, a change that reduced not only Wint's job duties, but also her salary by approximately $31,000.00.   [*Id.*] Defendants Smiley and Sumner were both present during the August 3 meeting, and Smiley told Wint that she should be thankful to Smiley for saving Wint's job as a nurse.   [*Id.*]   A few days later, Wint resigned her position at TCH.   [*Id.*]

Plaintiffs Melissa Davies and Beverly Underhill also allege that they were subjected to Smiley's "bullying and harassing behavior."   [*Id.* at 7.]   Additionally, Davies and Underhill opposed a new staffing plan sought to be implemented by Smiley and Sumner, which would have increased the patient to staff ratio in the Med-Surg Department.   [*Id.*]   Davies, the department's manager, and Underhill, a registered nurse, believed that this new plan would reduce the quality of patient

3

care at TCH.   [*Id.*]   Davies and Underhill voiced their concerns regarding Smiley's behavior and the new staffing plan to TCH higher-ups, including Smiley and Sumner.   [*Id.*]   Davies also filed a written grievance after Sumner told someone outside the hospital community that Davies and Underhill were "just complaining." [*Id.*]   Eventually, on or about February 2, 2016, Davies and Underhill met with three members of TCH's Board of Directors.   [*Id.*]   During the meeting, both plaintiffs opposed the proposed staffing plan and told the directors that Smiley had created a "hostile work environment" that they believed had a negative impact on staff morale and patient care.   [*Id.* at 8.]   The following afternoon, with Smiley present, Sumner terminated Davies' employment.   [*Id.*]   Also on February 3, an unnamed TCH employee told Underhill that she was going to be terminated.   [*Id.*] Instead, Underhill preemptively submitted her resignation.   [*Id.*]

Plaintiffs filed the instant action, alleging that the defendants' actions infringed upon their constitutionally protected right to free speech in violation of 42 U.S.C. § 1983 and Sections 1 and 8 of the Kentucky Constitution.   [*Id.* at 9-15.] Trigg County moved to dismiss, followed by TCH, Sumner, and Smiley.   [DN 7, DN 8.]   After responses and replies, Plaintiffs also filed a motion for leave to file a sur-reply.   [DN 17.]   TCH, Sumner, and Smiley responded to that motion.   [DN 18.] Following the parties' submission of supplemental briefs and replies on the issues raised by *Garcetti v. Ceballos*, 547 U.S. 410 (2006), this matter is ripe for adjudication.

## II. Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   In order to survive a motion to dismiss under Civil Rule 12(b)(6), a party must "plead enough factual matter to raise a 'plausible' inference of wrongdoing."   *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).   Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted.   *Id.* at 679.   The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief."   *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677-79).

## III. Discussion

### A. Plaintiffs' Motion for Leave to File Sur-Reply

In addition to Defendants' motions to dismiss, Plaintiffs' motion for leave to file a sur-reply is before the Court.   [DN 17.]   Plaintiffs tendered a proposed sur-reply with their motion, and as that sur-reply contains argument relevant to the below discussion, the Court will address Plaintiffs' motion first.   "Although the

Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.,* 339 F.3d 454, 481 (6th Cir. 2003)).

Here, Defendants TCH, Sumner, and Smiley filed a reply, in which they argued that they were shielded from liability in this case by sovereign immunity. [DN 16.]  These Defendants did address sovereign immunity in their original motion to dismiss, but their arguments were primarily based upon state law.   In their reply, TCH, Sumner, and Smiley do not directly address the arguments in Plaintiffs' response, but instead raise federal immunity doctrines not relied upon in their original motion to dismiss.  Therefore, it is only fair that Plaintiffs be afforded an opportunity to respond to these arguments.   The Court will consider Plaintiffs' tendered sur-reply in ruling on TCH, Sumner, and Smiley's motion to dismiss.

## B. Plaintiffs' § 1983 Claims

Each Plaintiff in this case asserts that Defendants, state actors, retaliated against her for exercising her First Amendment right to free speech.  If so, Defendants' conduct would violate 42 U.S.C. § 1983, which prohibits persons acting under color of state law from violating the constitutional rights of others.  However, not all speech in the public workplace reis protected by the First

6

Amendment. Rather, when public employees speak pursuant to their official duties, their speech is constitutionally unprotected. *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). At this stage of the case, all Plaintiffs have plausibly alleged that they spoke out as citizens on a matter of public concern and that Defendants TCH, Sumner, and Smiley retaliated against them because of their speech. *See Connick v. Myers*, 461 U.S. 138, 147 (1983); *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012). Although Plaintiffs' claims against Trigg County are barred by municipal immunity, their claims against TCH and against Sumner and Smiley in their individual capacities may proceed.

Plaintiffs claim that their opposition to the hiring of Smiley to fill the CNO position, to Smiley's behavior in the workplace, and to the proposed staffing plan changes caused Defendants to retaliate against them, culminating in Davies' termination and Wint's and Underhill's resignations. Plaintiffs allege that their opposition was First Amendment protected speech, and that by taking adverse action against them, Defendants acted unconstitutionally and in violation of 42 U.S.C. § 1983. That statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

To make out a prima facie case under § 1983, the plaintiff "must allege that a defendant acted under color of state law . . . [and] that the defendant's conduct deprived the plaintiff of rights secured under federal law." *Handy-Clay*, 695 F.3d at 539. Specifically, with respect to a First Amendment retaliation claim, "[a] § 1983 plaintiff must plead factual allegations sufficient to establish that '(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Id.* (citing *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010)). Additionally, because these Defendants are all governmental entities or actors, the Plaintiffs must also overcome the barriers of municipal and qualified immunity. Whether the Defendants are entitled to immunity, and the extent to which each is protected, is addressed in section III.B.3 of this opinion.

As a threshold matter, Plaintiffs must have plausibly alleged that Defendants acted under color of state law. In their complaint, Plaintiffs state that "Defendant Trigg County, Kentucky . . . is a political subdivision of the Commonwealth of Kentucky." [DN 1 at 2.] Additionally, they allege that Defendant Trigg County Hospital "is a component unit of Trigg County, Kentucky," a voting majority of its governing board being appointed by the Trigg County Fiscal Court. *Id.* Finally, Defendants Sumner and Smiley are alleged to be employees of TCH. *Id.* At the motion to dismiss stage, these allegations are sufficient for

Plaintiffs to make out their case that Defendants acted under color of state law. Whether Plaintiffs have plausibly pled a violation of their federal rights, however, is a more difficult question, and the first step is determining whether Plaintiffs engaged in speech protected by the First Amendment.

(1) *First Amendment Speech in the Public Workplace*

In the public employment context, not all speech and conduct is protected. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted).  One such limitation is placed upon speech made within the public workplace.  As the Sixth Circuit has stated, "The interest of a public employee 'in commenting on matters of public concern' must be balanced against the interest of governmental employers 'in promoting the efficiency of the public services it performs through its employees.'" *Burgess v. Paducah Area Transit Auth.*, 387 F. App'x 538, 543 (6th Cir. 2010) (citing *Garcetti*, 547 U.S. at 417).  The Supreme Court has long held that a government employee must speak out on a matter of public concern to receive First Amendment protection from retaliation in the workplace.  *See Connick v. Myers*, 461 U.S. 138, 147 (1983).  Even when the speech regards a matter of public concern, the reviewing court must engage in the *Pickering* balancing test, weighing the speaker's interest in commenting on those matters against the state's interest in efficiency.  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968).

More recently, the Supreme Court added a further wrinkle to the workplace speech jurisprudence when it decided *Garcetti v. Ceballos*, 514 U.S. 410 (2006). There, Richard Ceballos, a Los Angeles deputy district attorney, was contacted by a defense attorney who claimed that an affidavit used to obtain a search warrant contained certain inaccuracies.   *Id* at 413.   After conducting his own investigation, Ceballos agreed that the affidavit was inaccurate, and wrote a memo to his supervisors recommending that the case be dismissed.   *Id*. at 414.   Following a heated meeting, Ceballos' supervisors decided to continue with the prosecution.   *Id*. During the trial court's hearing on the defendant's motion to set aside the warrant, Ceballos testified as to his observations regarding the affidavit, but the warrant was upheld.   *Id*. at 414-15.

Following these events, Ceballos claimed that "he was subjected to a series of retaliatory employment actions . . . includ[ing] reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion."   *Id*. at 415.   He filed a § 1983 suit, alleging that his superiors "violated the First and Fourteenth Amendments by retaliating against him based on his memo."   *Id*.   The defendants argued, among other things, that "Ceballos' memo was not protected speech under the First Amendment."   *Id*.   Following a Ninth Circuit ruling in Ceballos' favor, the Supreme Court granted certiorari to decide "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties."   *Id*. at 413.

In a 5-4 decision authored by Justice Kennedy, the Court answered that question in the negative, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. In so holding, the Court attempted to strike a balance between the needs of government employers and the rights of government employees as citizens:

> Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.
>
> At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.

*Id.* at 418-19 (citations omitted).

Ultimately, the Court concluded that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to his official responsibilities. *Id.* at 424. According to the Court, "Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* at 421. As such, his speech was "made pursuant to [his] official responsibilities," and was unprotected. *Id.* at 424. Importantly, however,

the Court also wrote, "Restricting speech that *owes its existence* to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22 (emphasis added).

The majority's holding prompted three dissents, most notably from Justice Souter. He predicted that public employers would begin to write job descriptions broadly, in order to capture as much speech as possible. *See id.* at 431 n.2 (Souter, J., dissenting). In response, the majority wrote that to determine whether an employee's speech is made pursuant to his official job duties,

> [t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25. Thus, in determining whether a public employee's speech falls within the scope of *Garcetti*, and thus outside the scope of constitutional protection, a reviewing court must engage in a functional analysis of the employee's job responsibilities.

On several occasions, the Sixth Circuit has applied *Garcetti* in § 1983 cases involving public workplace speech. For instance, in *Fox v. Traverse City Area Public Schools Board of Education*, the court considered an elementary schoolteacher's claim that she was terminated in retaliation "for voicing concerns to her supervisors . . . that the size of her teaching caseload exceeded that allowable by law." 605 F.3d 354, 347 (6th Cir. 2010). The court held that in light of *Garcetti*, Fox's "complaint about class size '*owe[d] its existence to*' her responsibilities as a

special education teacher," and was therefore unprotected by the First Amendment. *Id*. at 349 (quoting *Weisbarth v. Geauga Park Dist.,* 499 F.3d 538, 544 (6th Cir. 2007)) (emphasis added).

Many scholars were critical of *Fox* and other lower court cases following *Garcetti*. They observed that by relying upon the "owes its existence" dictum, the Sixth Circuit and other courts "greatly expand[ed] the scope of the *Garcetti* exception." Scott R. Bauries & Patrich Schach, *Coloring Outside the Lines:* Garcetti v. Ceballos *in the Federal Appellate Courts*, 262 Ed. Law Rep. 357, 374 (2011). Perhaps in response to these concerns, the Supreme Court revisited public workplace speech in *Lane v. Franks*, __ U.S. __, 134 S.Ct. 2369 (2014). Edward Lane, the plaintiff, was hired by an Alabama community college to direct a statewide program for underprivileged youth. *Id*. at 2375. During an audit of the program's finances, Lane discovered that Suzanne Schmitz, an Alabama State Representative on the program's payroll, had not actually been performing her job duties as a counselor. *Id*. After Schmitz refused to work, Lane fired her. *Id*. Shortly thereafter, the FBI began investigating Schmitz, and Lane was called to testify before a federal grand jury. *Id*. Schmitz was indicted and tried for mail fraud and theft, and Lane was again subpoenaed to testify against her at trial. *Id*. After Schmitz was convicted, Lane was terminated by the president of the community college that administered the program, ostensibly because of budget cuts. *Id*. at 2376. Lane, however, claimed that he was fired in retaliation for testifying against Schmitz. *Id*. The Eleventh Circuit ruled against Lane, holding

13

that during his testimony, he spoke as a public employee, not as a citizen.   *See id.*
at 2376-77.   Notably, the lower court relied upon *Garcetti*'s "owes its existence"
language.   *Id.* at 2376.

A unanimous Supreme Court reversed, holding that "the First Amendment
protects a public employee," like Lane, "who provides truthful sworn testimony,
compelled by subpoena, outside the scope of his ordinary job responsibilities."   *Id.*
at 2378.   In so holding, the Court criticized the Eleventh Circuit for its broad
interpretation of *Garcetti*, stating:

> *Garcetti* said nothing about speech that simply relates to public
> employment or concerns information learned in the course of public
> employment.   The *Garcetti* Court made explicit that its holding did
> not turn on the fact that the memo at issue "concerned the subject
> matter of [the prosecutor's] employment," because "[t]he First
> Amendment protects some expressions related to the speaker's job."
> [*Garcetti*, 547 U.S. at 421.]   In other words, the mere fact that a
> citizen's speech concerns information acquired by virtue of his public
> employment does not transform that speech into employee—rather
> than citizen—speech.   The critical question under *Garcetti* is whether
> the speech at issue is itself ordinarily within the scope of an employee's
> duties, not whether it merely concerns those duties.

*Id.* at 2379.   Because Lane was hired to administer a federally-funded program,
not to testify, his testimony against Schmitz was not made pursuant to his official
duties.

In light of *Lane*, the Sixth Circuit revisited the *Garcetti* standard in *Boulton
v. Swanson*, 795 F.3d 526 (6th Cir. 2015).   That case involved Plaintiff Joseph
Boulton's testimony before a public arbitration panel.   *Id.* at 529.   Boulton, a
sergeant in the Genesee County, Michigan Sheriff's Office, testified that his
superior had misrepresented certain aspects of the Office's training procedures

earlier in the arbitration. *Id.* Following his testimony, Boulton alleged that members of the Sheriff's Office retaliated against his protected speech pursuant to an official policy barring criticism of the Office by its employees. *Id.* at 529-30.

The Sixth Circuit eventually upheld the district court's grant of summary judgment against Boulton on municipal immunity grounds. *See id.* at 535-37. Before it reached the issue of immunity, however, the Sixth Circuit discussed several cases it decided between *Garcetti* and *Lane*, including *Fox*:

> After *Garcetti,* we held that most jobs carry with them an inherent duty of internal communication. In *Weisbarth v. Geauga Park Dist.,* 499 F.3d 538 (6th Cir. 2007), a park ranger was terminated as a result of her conversations with a personnel consultant hired by the department. *Id.* at 540. We held that her conversations with the consultant were "ad hoc or de facto duties" of the job, and she therefore made statements as an employee and not as a citizen. *Id.* at 544. We have also categorized as part of the general duty of internal communication a memorandum from a police officer to his chief about the wisdom of a pending staff reduction, *Haynes v. City of Circleville, Ohio,* 474 F.3d 357, 364 (6th Cir. 2007), and a teacher's complaints to her supervisors that her class sizes were too large, *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.,* 605 F.3d 345, 348-49 (6th Cir. 2010).

> Determining whether speech is unprotected due to the *Garcetti* exception or because it is not on a matter of public concern has proven challenging. For example, in *Haynes,* we determined that speech owed its existence to professional responsibilities when an employee engaged in "controlled venting" by wrapping his equipment in Christmas paper and attaching a "Do Not Open Until Christmas" tag— in March. 474 F.3d at 360-61, 364. Similarly, in *Fox,* we cited to *Barnes v. McDowell*—a case on whether a dispute was a matter of public concern—as support for the proposition that a teacher was speaking as an employee. 605 F.3d at 349; *see also Handy–Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 541-42 (6th Cir. 2012) (applying *Haynes* and *Fox* to characterize speech that constituted merely a personnel dispute—and would therefore not be a matter of public concern—as being made pursuant to official duties).

*Id.* at 533.    Following this review of its precedent, the Sixth Circuit recognized that *Lane* "expressly reject[ed] an expansive reading of the *Garcetti* exception," specifically stating that "the phrase 'owes its existence to a public employee's professional responsibilities' must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Id.* at 533-34.    However, the court did not expressly state that its earlier cases, including *Fox*, which relied upon *Garcetti*'s "owes its existence" language were no longer good law in light of *Lane*.    Keeping in mind *Garcetti* and its progeny, the Court now turns to the case at hand.

(2) *Plaintiffs' Workplace Speech*

To establish a constitutional violation in this case, Plaintiffs must first prove that when they spoke out in the workplace, they spoke as citizens, and not pursuant to their official job duties.    Although Wint's speech presents a close question, at this early stage of the case, all Plaintiffs have plausibly alleged that their speech was constitutionally protected.    Wint's § 1983 claim is based upon the statements she made in meetings regarding Smiley's hiring.    [DN 1 at 12.]    In her complaint, Wint admits that she made these statements in a meeting with TCH's interim CEO and its Director of Human Resources.    [*Id.* at 4.]    She also notes that she was part of the interview panel that eventually hired Smiley.    [*Id.* at 5.]    These facts suggest that Wint was an integral part of the hiring process for the vacant CNO position.    However, drawing all reasonable inferences in Wint's favor, it is not entirely clear from the face of her complaint that Wint's speech opposing Smiley's

16

hiring was "ordinarily within the scope of [her] duties" as a member of the interview panel. *Lane v. Franks*, __ U.S. __, 134 S.Ct. 2369, 2379 (2014).  Discovery will flesh out the ordinary scope of Wint's duties and the precise context in which she made her statements.

Whether Davies' and Underhill's speech was constitutionally protected is a different question, and depends upon whether *Fox* is still good law in light of *Lane* and *Boulton*.  Indeed, the facts of *Fox* and the instant case are very similar.  In *Fox*, the plaintiff complained to her supervisors that the size of her student caseload exceeded that allowed by state law.  605 F.3d at 347.  Just as the plaintiff in *Fox* was concerned about the student-teacher ratio in her school, Davies and Underhill were concerned about the patient-staff ratio in their hospital.  The *Fox* court held that the plaintiff's statements regarding the student-teacher ratio were constitutionally unprotected, and it is difficult to distinguish between the nature of Fox's statements and the nature of Davies' and Underhill's statements.  But the *Fox* court based its holding upon the fact that Fox's "complaint . . . 'owe[d] its existence to' her [job] responsibilities," *id*. at 349 (quoting *Weisbarth*, 449 F.3d at 544), language that the *Boulton* court later called into question, *see* 795 F.3d at 534.

This Court may eventually have to decide whether the Sixth Circuit's decision in *Boulton* impliedly overruled its decision in *Fox* – a knotty jurisprudential question, undoubtedly.  However, the Court will similarly afford the parties an opportunity to conduct discovery before answering that question.  As evidenced by the parties' supplemental briefs, there is an outstanding factual disagreement

17

regarding whether Davies' and Underhill's statements regarding the quality of patient care were made pursuant to their responsibilities as TCH employees. Davies and Underhill claim that their speech "was not within the scope of their ordinary duties," [DN 22 at 9], while TCH asserts that "the statements were made in the furtherance of the workplace and the job duties of the Plaintiffs," [DN 25 at 3.] But the parties make these claims without any record support – understandably, as this case is in its infancy.   Drawing all reasonable inferences in Davies' and Underhill's favor, those Plaintiffs, like Wint, allege a plausible claim for relief sufficient to survive a motion to dismiss.   Furthermore, a more developed factual record should enable the Court to more accurately determine whether all Plaintiffs spoke out on a matter of public concern, and whether the factors set forth in *Pickering* weigh in their favor.

To prevail on their § 1983 claim, Plaintiffs must also prove that "an adverse action was taken against [them] that would deter a person of ordinary firmness from continuing to engage in that conduct[,] and [that] the adverse action was motivated at least in party by the plaintiff[s'] protected conduct."   *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012) (citing *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010)).   Davies alleges that she was terminated after voicing her concerns regarding patient care to members of TCH's Board of Directors, [DN 1 at 9], and termination is the prototypical form of adverse employment action.   *See Fritz*, 592 F.3d at 724 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc)).   Wint and Underhill, meanwhile, allege

18

that they were constructively discharged.   [DN 1 at 13; *id.* at 11.]   Constructive discharge may also constitute adverse action for § 1983 purposes, and to prove it, "a plaintiff must adduce evidence to show that (1) 'the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' (2) the employer did so 'with the intention of forcing the employee to quit,' and (3) 'the employee . . . actually quit.'"   *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)) (alterations in original).   At this early stage of the case, Plaintiffs' allegations that Defendants created a "hostile work environment" through "bullying and harassing behavior," [DN 1 at 7], are sufficient to "raise a 'plausible' inference" that they were subjected to an adverse employment action, *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plaintiffs also sufficiently allege that Defendants' adverse action against them "was motivated at least in part by [their] protected conduct."   *Handy-Clay*, 695 F.3d at 539.   According to their complaint, Davies' termination and Underhill's resignation both occurred one day after they spoke to TCH's Board of Directors. [DN 1 at 8.]   Similarly, Wint resigned a few days after she was demoted by Smiley and Sumner.   [*Id.* at 6.]   While the Sixth Circuit has previously stated that "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim," *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007), the court has also held that in the employment discrimination context,

19

"temporal proximity [is] a valid basis from which to draw an inference of retaliatory motivation under limited circumstances," *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008)).   Moreover, Plaintiffs allege not only that their discharge from TCH occurred close in time to their protected speech, but also that Sumner and Smiley made statements and took actions indicating that Plaintiffs were being discharged because of their speech. *See* [DN 1 at 6-7.] These allegations are sufficient to raise a reasonable inference of causation. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).   Therefore, because Plaintiffs' complaint alleges "a plausible theory of relief" with respect to all three elements of their § 1983 First Amendment retaliation claims, *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 US at 677-79), their claims may proceed, subject to the limitations explained in the following section.

(3) *Municipal and Qualified Immunity*

Even if Plaintiffs' speech was constitutionally protected, their claims might still be barred by municipal or qualified immunity.   Under § 1983, "a municipality or other local governing body is a 'person' and may be sued for monetary, declaratory, or injunctive relief."   13D C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3573.1 (3d ed. 2016).   Similarly, Sumner and Smiley, the individual defendants in this suit, may avail themselves of the "rather elaborate set of rules on immunity for government actors." *Id.* § 3573.3.   The Court will address immunity with respect to each Defendant in turn.

20

First, all claims against Defendant Trigg County, Kentucky must be dismissed. In *Monell v. Department of Social Services of City of New York*, the Supreme Court held that municipalities and other local government units are "persons" for the purposes of § 1983. 436 U.S. 658, 690 (1978). However, they may only be sued "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Stated otherwise, to prevail against Trigg County, Plaintiffs "must prove that the County itself was to blame, rather than its individual officials." *Boulton v. Swanson*, 795 F.3d 526, 535 (6th Cir. 2015) (citing *Monell*, 436 U.S. at 694-95). The County cannot be liable under a *respondeat superior* theory of liability. *Monell*, 436 U.S. at 692. Plaintiffs' complaint does not allege that their harm was inflicted by any Trigg County policy or custom; indeed, they never allege such a policy exists. *See* [DN 1.] Thus, the only way the County can be liable to Plaintiffs under § 1983 is if Sumner and Smiley can be characterized as Trigg County's "municipal policymaker[s]." *City of Ok. City v. Tuttle*, 471 U.S. 808, 824 (1985).

On this point, Plaintiffs argue that as the hospital's CEO and CNO, respectively, "Sumner and Smiley are properly considered policymakers whose decision to take adverse employment actions against the Plaintiffs" subjects the County to liability under § 1983. [DN 13 at 12.] In support of this argument, Plaintiffs cite *Malak v. Associated Physicians, Inc.*, 784 F.2d 277 (7th Cir. 1986) and *Kattar v. Three Rivers Area Hospital Authority*, 52 F. Supp. 2d 789 (W.D. Mich.

21

1999).   But neither of these cases is binding upon this Court, and both are distinguishable.   In *Malak*, an emergency room physician sued, among others, the public hospital that previously employed him, its CEO, and its head nurse.   *Malak*, 784 F.2d at 278.   The plaintiff alleged that he was terminated in retaliation for his public criticisms of the hospital's emergency room conditions.   *Id*.   In overturning the district court's grant of summary judgment, the Seventh Circuit held that the "chief executive officer of a governmental hospital is surely a policymaker *for that hospital*."   *Id*. at 284 (emphasis added).   Similarly, in *Kattar*, a fellow district court in this circuit stated that a hospital CEO "had the authority to establish and carry out policy decisions on behalf of [the hospital]."   *Kattar*, 52 F. Supp. 2d at 801 n.9.   But *Malak* and *Kattar* do not address whether high-ranking hospital officials are policymakers for the municipal government; they address only the officials' status as policymakers for the hospital.

Instead, to determine whether Sumner and Smiley are Trigg County's final policymakers, the Court must look to state law.   *Waters v. City of Morristown, Tenn.*, 424 F.3d 353, 362 (6th Cir. 2001).   In a 2010 case, the Kentucky Court of Appeals described the formation and structure of county hospitals in the Commonwealth:

> KRS 216.310, *et seq.*, [] was enacted by the Legislature to allow counties to form hospital districts.   The Legislature shed light on the purpose of this legislation in KRS 216.310, which states as follows:
>
> > This legislation is designed to permit a county to form a hospital district or two (2) or more counties to join together in the formation of a hospital district in order to provide a broader basis for local support of hospitals and related health facilities

including supportive services and the training and education of health personnel . . . .

In addition, the Legislature established county hospital districts as taxing districts through KRS 216.317, which states as follows:

Upon the creation of a hospital district, as provided in KRS 65.182 and 216.320, the district shall constitute and be a taxing district within the meaning of Section 157 of the Constitution of Kentucky and the county shall be a participating county in the district.

Further, KRS 216.315 states that the secretary for the Cabinet for Health and Family Services shall be the secretary for all county hospital districts.  Moreover, KRS 216.323 grants the county judge executive of the county the authority to appoint members to the hospital district's board.  Finally, KRS 216.335 gives the District the power to enter into contracts, buy and sell land, and exercise the power of eminent domain.

*Fryman v. Fleming Cty. Hosp*, No. 2009-CA-000865-MR, 2010 WL 1508187, at *3 (Ky. Ct. App. Apr. 16, 2010).   The applicable statutes, cited above by the Kentucky court, demonstrate that the county judge-executive and the hospital district's board, rather than individual administrators, are the county's policymakers with respect to hospital policy.   Moreover, "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials."   *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).   By Plaintiffs' own admission, when they felt their concerns were not being properly addressed by Sumner and Smiley, they appealed to members of the hospital's board of directors.   [DN 1 at 7-8.]   Plaintiffs cannot admit they sought redress from a higher authority than Sumner and Smiley and, at

the same time, claim that Sumner and Smiley are final policymakers for the County.   Therefore, all claims against Trigg County must be dismissed.

However, the same cannot be said for Trigg County Hospital.   While Sumner and Smiley might not be final policymakers for the County, *Malak* and *Kattar* demonstrate that, at least at this preliminary stage, they may be considered final policymakers for the hospital itself.   Plaintiffs claim that Sumner and Smiley acted as supervisors at TCH, and were jointly responsible for personnel decisions and staffing changes.   *See* [DN 1 at 1; *id*. at 6-8.]   At the motion to dismiss stage, these factual allegations are sufficient to plausibly allege that Sumner's and Smiley's "edicts or acts may fairly be said to represent [the] official policy" of TCH.   *Monell*, 436 U.S at 694.   Therefore, Plaintiffs' claims against Defendant Trigg County Hospital need not be dismissed upon municipal immunity grounds.

Finally, the claims against Sumner and Smiley in their individual capacities may remain.[1]   In a § 1983 suit, certain government officials may be protected by qualified immunity.   Under that doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   To determine whether qualified immunity

---

[1] The claims against Sumner and Smiley in their official capacities, however, must be dismissed. "Official capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Ky. v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell*, 436 U.S. at 690 n. 55).   Because Plaintiffs' complaint asserts claims against both Trigg County Hospital and Sumner and Smiley in their official capacities, it is proper for the Court to dismiss the duplicitous official-capacity claims.   *See Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996).

protects a particular official, a reviewing court must first "ask whether the plaintiff suffered a violation of his constitutional rights.   Second, the court must ask if the constitutional right in question was a clearly established constitutional right of which a reasonable person would know."   *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006) (internal citations omitted).   As discussed in the previous section, Plaintiffs' complaint raises a plausible inference that their First Amendment rights were violated.   Thus, whether Sumner and Smiley are entitled to qualified immunity "hinges on whether [Plaintiffs'] right[s] were clearly established such that a reasonable person would know" that discharging them would violate their constitutional rights.   *Id.*   The Sixth Circuit has previously recognized that "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern."   *Chappel v. Montgomery Cnt. Fire Protection Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997).   It may become apparent at a later point in this case that, even if Plaintiffs' speech was constitutionally protected, "it would be unclear to a reasonable official what the outcome of the [*Pickering*] balancing inquiry should be." *Williams v. Kentucky*, 24 F.3d 1526, 1537 (6th Cir. 1994).   In that case, Sumner and Smiley would indeed be entitled to qualified immunity.   But the record before the Court is too bare to make that determination at this point.

In sum, Plaintiffs plausibly allege that their workplace speech merits First Amendment protection, and that they were discharged in retaliation for their constitutionally protected conduct.   However, Plaintiffs have not sufficiently

alleged that Trigg County is responsible for their injuries, and Plaintiffs' claims against Sumner and Smiley in their official capacities are duplicitous of their claims against the hospital.   Therefore, only their claims against TCH and Sumner and Smiley in their individual capacities may stand.   Trigg County's motion to dismiss [DN 7] is GRANTED, and TCH's, Sumner's, and Smiley's motion to dismiss [DN 8] is GRANTED IN PART and DENIED IN PART.

### C. Plaintiffs' Claims Under the Kentucky Constitution

In addition to their claims under 42 U.S.C. § 1983, Plaintiffs also assert claims arising under Sections 1 and 8 of the Kentucky Constitution.   Section 1 provides, in pertinent part, "All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: . . . . The right of freely communicating their thoughts and opinions."   Ky. Const. § 1. Section 8 goes on to promise, "Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty."   Ky. Const. § 8.   Defendants argue, and Plaintiffs concede, that Kentucky law does not recognize a cause of action under its Constitution.   *See Baker v. Campbell Cnty. Bd. of Educ.*, 180 S.W.3d 479, 482-84 (Ky. Ct. App. 2005) (no private right of action under Section 1).   This Court has rejected claims arising under the Kentucky Constitution on multiple prior occasions, and it does so again today.   *See, e.g.*, *Jackson v. Murray State University*, 834 F. Supp. 2d 609, 614-15 (W.D. Ky. 2011) (no private cause of action under Sections 1, 2, and 3); *Welch v. Gill*, No. 5:03-CV-73-R, 2006 WL 861295, at *4 (W.D. Ky. Mar. 28, 2006) (no private cause of action under Section 1).

26

In Plaintiffs' response to Defendant Trigg County's motion to dismiss, after conceding that they have no claim for damages under the state constitutional provisions, Plaintiffs state that they seek injunctive relief. [DN 13 at 13.] However, at no point in their complaint did Plaintiffs ask for an injunction, which would presumably require the hospital to re-hire Plaintiffs.  Therefore, Plaintiffs' claims based upon Sections 1 and 8 of the Kentucky Constitution must be dismissed.

## IV. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED:

(1) Plaintiffs' motion for leave to file a sur-reply [DN 17] is GRANTED;

(2) Defendant Trigg County's motion to dismiss [DN 7] is GRANTED.   All claims against Defendant Trigg County are DISMISSED WITH PREJUDICE.

(3) Defendants Trigg County Hospital, Inc.'s, John Sumner's, and Fredia Smiley's motion to dismiss [DN 8] is GRANTED IN PART and DENIED IN PART. All of Plaintiffs' claims arising under the Kentucky Constitution are DISMISSED WITH PREJUDICE, and all of Plaintiffs' claims against Sumner and Smiley in their official capacities are DISMISSED WITH PREJUDICE.  The only claims remaining in this action are Plaintiffs' § 1983 claims against Defendant Trigg County Hospital, Inc., Defendant John Sumner in his individual capacity, and Defendant Fredia Smiley in her individual capacity.

CC: Counsel of Record